E-FILED
Wednesday, 09 April, 2008  11:38:14 AM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION

GCIU-EMPLOYER RETIREMENT FUND, )
                                             )
    Plaintiff,                      )
                                             )
    v.                           )   No.  07-1174
                                             )
THE GOLDFARB CORPORATION, a    )
Canadian corporation,            )
                                             )
    Defendant.                 )

## REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

GCIU-Employer Retirement Fund (the Fund), a multi-employer pension plan, seeks to collect withdrawal liability payments from the Goldfarb Corporation under ERISA.[1]  Before the Court is the Goldfarb Corporation's motion to dismiss for want of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).  For the reasons below, the Court recommends the motion be granted.

---

[1] The Fund is a "multiemployer pension plan" under ERISA.  "When an employer that participates in a pension plan decides to withdraw, . . . it is required to pay withdrawal liability . . . .  For purposes of determining withdrawal liability, ERISA defines an 'employer' as the business that directly participates in the plan, as well as those entities that constitute the business's 'control group.'"  Central States, Southeast and Southwest Areas Pension Fund v. Phencorp Reinsurance Co., Inc., 440 F.3d 870, 874 (7th Cir. 2006).  The Fund alleges that the Goldfarb Corporation is part of that control group.

**Standard**

> If personal jurisdiction is challenged under Rule 12(b)(2), the
> court must decide whether any material facts are in dispute.  If
> so, it must hold an evidentiary hearing to resolve them, at which
> point the party asserting personal jurisdiction must prove what it
> alleged.  Until such a hearing takes place, the party asserting
> personal jurisdiction need only make out a *prima facie* case of
> personal jurisdiction.

Hyatt International Corp. v. Coco, 302 F.3d 707, 713 (7th Cir. 2002).  If the

decision is made solely on written submissions, relevant factual disputes

are resolved in favor the plaintiff, the complaint "'read . . . liberally, in its

entirety, and with every inference drawn in favor'" of the plaintiff.  Central

States, Southeast and Southwest Areas Pension Fund v. Phencorp

Reinsurance Corp., Inc., 440 F.3d 870, 878 (7th Cir. 2006).  The Fund's

allegations are taken as true unless the defendant's affidavits controvert

them.  Travelers Cas. & Sur. Co. v. Interclaim (Bermuda) Ltd., 304

F.Supp.2d 1018, 1021 (N.D. Ill 2004).

   The plaintiff bears the burden of proving a *prima facie* basis for

personal jurisdiction.  RAR, Inc. v. Turner Diesel, Ltd., 107 F.3d 1272, 1275

(7th Cir.1997).The plaintiff must show a *prima facie* basis for personal

jurisdiction before being permitted discovery on the issue.  Phencorp, 440

F.3d at 877-78.

# Facts[2]

The Goldfarb Corporation is a publicly traded Canadian company, its principal place of business in Toronto, Ontario, Canada.  (Alonna Goldfarb Aff. ¶ 3, attached to d/e 6; Complaint ¶ 7).  Martin Goldfarb and Alonna Goldfarb were officers, directors and shareholders of the Goldfarb Corporation.  (Complaint ¶ 19).  Stanley Goldfarb was a director and shareholder of the Goldfarb Corporation.[3]

Alonna Goldfarb, Secretary and General Counsel for the Goldfarb Corporation, avers that, at no time, in any state of the United States, did the Goldfarb Corporation: maintain a place of business; employ individuals; have a license to conduct business in the United States; conduct business; advertise or solicit business; designate an agent for service; serve customers; or, own real estate.  She also avers that:

8.  Goldfarb did not direct or control the daily affairs of Fleming. Goldfarb did not, for example, direct or control the internal policies of Fleming.

---

[2]The Court finds these facts based on the written submissions in this case, taking the plaintiff's uncontroverted allegations as true and resolving any relevant disputes in favor of the plaintiff.

[3]The facts section will clearly describe the relationships of the parties and their relationship to Fleming Packaging Corporation (Fleming).  Detailed facts are required to understand the business relationships.

9.  Goldfarb and Fleming have maintained separate payrolls, separate bank accounts, separate leases, and filed separate tax returns.

(Alonna Goldfarb Aff. ¶¶ 8-9, attached to d/e 6).

The Fund does not dispute these averments.  Consequently, the court accepts them as true for purposes of this order.  Travelers Cas. & Sur. Co. V. Interclaim Ltd., 304 F.Supp.2d 1018, 1020 (N.D. Ill. 2004)(defendants' unrefuted facts accepted as true).

In April 1995, the Goldfarb Corporation bought 66% of the stock in Fleming Packaging Corporation ("Fleming").  Fleming was a Delaware Corporation, its principal place of business in Peoria, Illinois.  (Complaint ¶ 8; Alonna Goldfarb Aff. ¶ 5).  Fleming was "one of the largest North American printers of value-added labels and specialty packaging products, . . ." with 10 plants in the U.S., Canada and Mexico.  (Complaint ¶ 8).  It operated a lid business in Peoria, Illinois ("Webkote") and a Peoria plant that prepared labels for liquor companies.  (Complaint ¶ 8).  In December 2001, the Goldfarb Corporation's stock ownership in Fleming increased to 82.2%, as a result of purchasing common stock and warrants held by debtors.  (Complaint ¶ 26; Alonna Goldfarb Aff. ¶ 6).  Because its ownership was over 80%, the Goldfarb Corporation was considered a

member of the "controlled group" under 29 U.S.C. § 1301(b)(1).

(Complaint ¶ 26).

Fleming, through its wholly-owned subsidiaries (fp Fast Printing, Inc. and fp Label Co.) entered into collective bargaining agreements that required contributions to Plaintiff, GCIU[4]-Employer Retirement Fund (the "Fund"), a multi-employer pension plan.  (Complaint ¶10; d/e 9, p. 2). These agreements were effective September 1, 1999 through August 31, 2002, and July 1, 2000 through June 2003.  (Complaint ¶ 10).

The Goldfarb Corporation nominated five of Fleming's nine directors from April 1995 to April 1998.[5] (Alonna Goldfarb Aff. ¶ 7, attachment to d/e 6). Thereafter the Goldfarb Corporation nominated three of nine Fleming directors until February 2003.  (Alonna Goldfarb Aff. ¶ 7; Complaint ¶¶ 70-72).  Martin, Stanley and Alonna Goldfarb acted as three of Fleming's directors from at least 1998 until February 2003.  (Complaint ¶ 19, 20, 24). In March 2001, the Goldfarbs (Martin, Stanley and Alonna) were also elected officers of Fleming, along with others.  (Complaint ¶ 25).  Martin and Stanley were elected co-chairmen of Fleming and Alonna was elected

_____

[4]Graphic Communications International Union.

[5]The Complaint alleges there were 11 directors in 1998.  (Complaint para. 19)

secretary.  (Complaint ¶ 25).  Before March 2001, the Goldfarbs had not acted as officers of Fleming.  Individuals other than the Goldfarbs were elected as CEO/ President, CFO/Treasurer and Assistant Secretary of Fleming.

In 1997, Fleming entered into a loan agreement with Bank One N.A., which was amended several times over the years (Complaint ¶ 17), apparently in response to Fleming's financial difficulties and default on the loan.  In March 2000, Fleming received an offer to purchase, but it "did not come to fruition."  (Complaint ¶ 22).  Thereafter, "the Goldfarb Corporation took Fleming Packaging Corporation off the market, and embarked on a turn around strategy."  (Complaint ¶ 23).[6]

Fleming apparently continued to have difficulty paying its loans, and in April 2001, Fleming's debt holders put their warrants to Fleming.  The following October the Goldfarb Corporation purchased some of the debtors' stock and warrants, thus increasing its ownership to 82.2%.  (Complaint ¶ 26; Alonna Goldfarb Aff. ¶ 6).

In December 2001, Fleming presented a restructuring plan to the lenders which included a cash injection by shareholders in the amount of

---

[6]The Fund cites no evidence to support this assertion, but the Goldfarb Corporation does not dispute it.

$1.3 million.  (Complaint ¶¶ 28-30).  "The Goldfarb Corporation intended to back up the $1.3 million, or offered it to other Fleming Packaging Corporation shareholders if they wanted to participate."  (Complaint ¶ 30). The lenders rejected this proposal, however, and in February 2002, the lenders declared Fleming in default.  (Complaint ¶ 32; Fund's response, d/e 9, p. 5).

On March 11, 2002, Fleming and Bank One entered into a third amendment to the loan agreement.  Part of the third amendment required Fleming to sell off its lid business (fp Webkote) and another business (fp Spiralkote).  (Complaint ¶ 41).   The same day, Bank One and the Goldfarb Corporation entered into a letter agreement in which the Goldfarb Corporation agreed to make a secured, subordinated loan of $1.5 million to Fleming if and when Fleming sold off its lid business ("Webkote") for a specified minimum amount.  Apparently Fleming's other directors and officers were  not aware of this letter agreement between Bank One and the Goldfarb Corporation until July 2002.  (d/e 9, Ex. E).  The March 2002 letter agreement is governed by Michigan law and provides that federal or state courts in Michigan have jurisdiction with regard to "'legal action[s] or

proceeding[s] brought with respect to this letter.'"[7]  (Complaint ¶ 40).  The Goldfarbs retained Mesirow Financial to assist in the sale of Fleming's divisions of Webkote and Spiralkote.  (Complaint ¶ 41).

A fourth amendment to the loan agreement was executed in May 2002, but its contents are not in the record.  (Complaint ¶ 42).

In July 2002, Martin, Alonna and Stanley Goldfarb met privately in Canada with Bank One representatives Joanna Anderson and Jerry Hinds, before a scheduled board of directors' meeting for Fleming.  (Complaint ¶ 44).  A summary of that meeting states:[8]

> J.W. (Joanna) Anderson and I met with the principals of this Canadian public (TSE) company: Martin (Marty) Goldfarb, Stan Goldfarb, and Alanna Goldfarb. . . .
>
> *    *    *
>
> This meeting . . . was one hour ahead of the Bank Group Meeting with FPI[9] and Goldfarb.  The other banks were not in our meeting, nor was the Company.  This is consistent with

---

[7]The letter agreement, loan agreement, and loan amendments are not in the record, but the Goldfarb Corporation does not dispute the Fund's characterization of them.

[8]The meetings were in regards to Fleming's loan defaults.   (Anderson Dep., Ex. D to d/e 9, pp. 5, 17).  The summary bears the initials "JAH," purportedly Jeremiah Hines, a former credit officer in the Canadian branch of Bank One.  (Anderson Dep. p. 11).

[9]Fleming Packaging, Inc.

prior Goldfarb practice, in which they allegedly reveal to the
Bank(s) things they have or will not disclose to FPI.  (This was
to back-fire slightly later in the day).

(Ex. E attached to the Fund's response, d/e 9, parentheses in original)[10].

The summary continues, "Goldfarb had a plan and they needed Bank
One's help to execute it."  Id.  The plan was to sell two divisions of Fleming
(WebKote and Spiral Kote), sales that had already been arranged by the
Goldfarb Corporation.  The sales were expected bring in $30.5 million total.
The Goldfarb Corporation intended to use $4.5 million of these proceeds to
restructure Fleming by consolidating the Peoria operations and closing the
Florida, Mexico and Napa estate wine label operations.  "The Goldfarb's
premise is that it can use funds to restructure FPI, increase the EBITDA[11]
and value, and pay us out by December 2002 . . . . [T]he Bank Group's
debit was to be cut in half by 12/31/02 . . . ."  Id.

According to the summary, at the meeting the Goldfarb Corporation
reneged on its promise to infuse $1.5 million into Fleming, reminding Bank
One that "Fleming does not know about it."  Id.  The summary states that

_____

[10]The Goldfarb Corporation does not dispute the authenticity of the summary or
its consideration by the Court.  The Court assumes for purposes of this order only that
the truth of the matters asserted in the summary could be shown in an evidentiary
hearing.

[11]"Earnings Before Interest, Taxes, Depreciation and Amortization."
www.investopedia.com, dictionary (last visited March 27, 3008).

the Goldfarb Corporation considered "the money in Fleming lost," but was cooperating only to repay a banker with whom the Goldfarb family had a personal relationship.  The other banks did not accept the plan proposed by the Goldfarb Corporation, instead insisting that Fleming hire an independent consultant acceptable to the banks.  Id. p. 2.  Fleming apparently first learned of the $1.5 million letter agreement at its meeting with the banks after the "secret" meeting between Bank One and the Goldfarb Corporation.  (d/e 9, Ex. E, p. 2).

In August 2002, Alonna Goldfarb, on behalf of the Goldfarb Corporation, traveled to Peoria, Illinois.  (Complaint ¶ 46).  There is no further information about this visit, nor is it addressed in Alonna Goldfarb's affidavit.

In September 2002, Fleming did sell its lid business, triggering the Goldfarb Corporation's duty to loan $1.5 million to Fleming under the letter agreement.  The Goldfarb Corporation, however, did not come through with the promised loan.  In September 2002, Bank One made a written demand on the Goldfarb Corporation and notified Fleming of its default under the loan agreement.  (Complaint ¶¶ 49-50).

Further negotiations between Bank One, Fleming and the Goldfarb Corporation ensued.  According to Joanna Anderson (a Bank One representative at the time), the Goldfarb Corporation sought to condition its $1.5 million dollar loan on the bank putting in additional money for restructuring.  (Anderson Dep. pp. 20-21, attached as Ex. D to d/e 9).  The negotiations resulted in an agreement that the Goldfarb Corporation loan at least $765,000 of the $1.5 million to Fleming.  (Complaint ¶¶ 55-56; Anderson Dep. pp. 21-22).  Bank One subsequently looked into whether adding more cash made sense and ultimately decided against it in favor of a sale.  (Anderson Dep. pp. 21-22). Negotiations continued, and at some point the Goldfarb Corporation agreed in principal to advance $1.5 million in sub-debt to Fleming (in addition to the $1.5 already promised) if the Lenders funded Fleming's operation until July 2003.  (Complaint ¶ 57).  It does not appear that this agreement was formalized or that anything else became of it.

In December 2002 or January 2003,the lenders rejected Fleming's proposals to continue operations and sought to have Fleming sold.  The lenders gave notice of default, and retained bankruptcy lawyers. (Complaint ¶¶ 58-59).

In February 2003, a fifth amendment to the loan agreement was executed.  The banks agreed to hold off on exercising their default rights in return for the Goldfarb Corporation's relinquishment of control over Fleming "'to an acceptable third party to assure the thoroughness and fairness" of Fleming's sale.  (Complaint ¶ 62; Anderson Dep. p. 33).[12]  The lenders agreed to forgive the Goldfarb Corporation's obligations if the Goldfarb Corporation caused its officers to resign from Fleming's Board of Directors and executed an irrevocable proxy to vote its shares to George Gialenios, who it appears had been hired in 2002 to develop a plan for Fleming's restructuring.  (Complaint ¶¶ 63-64); Rafool v. The Goldfarb Corp., Adv. No. 04-8166, 3/7/08 Order, p. 2 (In re Fleming Packaging Corp., No. 03-82408 (Bankr. C.D. Ill.)).  The Goldfarb Corporation was to receive 3.5% of the net proceeds of the sale if the Goldfarbs relinquished their control and permitted the sale.  (Complaint ¶ 68).  Two wholly owned subsidiaries of Fleming, fp Label Company, Inc. and fp Estate Company, Inc., agreed in the fifth amendment to be guarantors.[13]  (Complaint ¶ 61).  George Gialenios released the Goldfarb Corporation from its guarantee of

---

[12]The Fifth Amendment is not in the record, but Goldfarb does not dispute the terms as alleged.

[13]There is no more information on the role of these divisions in the fifth amendment or otherwise.

$300,000 due to Gialenios under an employment agreement with Fleming. (Complaint ¶ 66).

In February 2003, Stanley, Martin and Alonna Goldfarb resigned as directors of Fleming and the Goldfarb Corporation signed an irrevocable proxy to George Gialenios.

On May 15, 2003, Fleming filed for bankruptcy in the Central District of Illinois. *In re* Fleming Packaging Corp., No. 03-82408 (Bankr. C.D. Ill.). Two subsidiaries of Fleming (fp Label Co. and fp Estate, Inc.) also filed for bankruptcy. The Goldfarb Corporation filed a proof of claim in the bankruptcy proceeding for $771,309, the amount loaned to Fleming plus the expenses incurred by Alonna Goldfarb for her August 2002 travel to Illinois. (Complaint ¶ 76).[14]

In July 2003 the Bankruptcy Court approved the sale of Fleming for about $26 million, "substantially less than the balance due its secured lenders." *In re* Fleming Packaging Corp., 370 B.R. 774, 780 (Bankr. C.D. Ill. 2007).[15] On or about June 17, 2003, the collective bargaining agreements "were repudiated." (Complaint ¶ 77). On or about July 1,

---

[14]The bankruptcy docket reflects that the Fund also filed a claim for withdrawal liability for about $88,000.

[15]This bankruptcy opinion sets forth a thorough summary of the adversary proceeding against the Goldfarbs and the Goldfarb corporation.

2003, the Fund determined that Fleming had effected a "complete withdrawal" from the fund under ERISA.  (Complaint ¶ 79).

In July 2004, the bankruptcy trustee, on behalf of Fleming's Estate, brought an adversary proceeding against the Goldfarb Corporation, the Goldfarbs (Martin, Stanley and Alonna), and others.  *See* In re Fleming Packaging Corp., 370 B.R. 774 (Bankr. C.D.Ill. 2007).  That action involves many of the same transactions and events alleged here.[16]  Id.  A summary judgment motion is pending in the adversary proceeding on surviving counts of breach of fiduciary duties and fraudulent/preferential transfer. (d/e 286 in adversary proceeding, Rafool v. The Goldfarb Corp., Adv. No. 04-8166 (*In re* Fleming Packaging Corp., No. 03-82408 (Bankr. C.D. Ill.)).

In September 2004, the Fund issued a notice of failure to pay withdrawal liability to the Goldfarb Corporation, demanding payment. Counsel for the Goldfarb Corporation responded that the Goldfarb Corporation was not subject to personal jurisdiction and that ERISA did not reach it in Canada.  (Complaint ¶ 83).  The Fund filed this action in June

---

[16]The Court's review of the bankruptcy proceedings has been cursory, as the parties here do not discuss them in any detail.  The facts uncovered in the bankruptcy proceedings may be different or more detailed than those set forth here.  The facts set forth in this recommendation are based on the pleadings and record in this case.  They are set forth only for purposes of analyzing personal jurisdiction question and only for purposes of this recommendation.

2007, seeking to collect the withdrawal liability payments from the Goldfarb Corporation. The Goldfarb Corporation moved to dismiss for lack of personal jurisdiction, the motion now before the Court.

## Analysis

"'Any district court in which a plaintiff brings an action under Title I of ERISA will have personal jurisdiction over the defendant,' if the defendant is properly served and has sufficient minimum contacts with the United States." Central States, Southeast and Southwest Areas Pension Fund v. Phencorp Reinsurance Co., Inc., 440 F.3d 870, 875 (7th Cir. 2006)(quoted cite omitted).

The Goldfarb Corporation does not dispute proper service. (d/e 7, p. 4). Thus, the question is whether the Goldfarb Corporation has "sufficient minimum contacts" to be subject to personal jurisdiction in this lawsuit. "The contacts 'may be related or unrelated to the facts forming the basis for the lawsuit.'" Phencorp, 440 F.3d at 875 (quoted cite omitted). If related, specific personal jurisdiction may exist. If unrelated, general personal jurisdiction might still be established.[17] Id.

---

[17]If the Court finds that minimum contacts do exist, the court then examines other factors to determine whether "the exercise of personal jurisdiction satisfies traditional notions of fair play and substantial justice." Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp., 230 F.3d 934, 943 (7th Cir. 2000),

The contacts must be purposeful:  "[T]he defendant's conduct and connection with the forum are such that the defendant "should reasonably anticipate being hailed into court . . . ."  Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp., 230 F.3d 934, 943 (7th Cir. 2000), *citing* Burger King, 471 U.S. at 474 (1985).  Such reasonable anticipation arises when the defendant "purposefully availed itself of the privilege of conducting activities in the forum, invoking the benefit and protection of its laws."  Id., *citing* Burger King, 471 U.S. at 474-75.

The Fund argues that this Court may exercise specific jurisdiction over the Goldfarb Corporation.  (d/e 9, p. 3).

> To decide whether specific personal jurisdiction may be exercised, a court must engage in three distinct steps in the following order: (1) identify the contacts the defendant has with the forum; (2) analyze whether those contacts meet constitutional minimums and whether exercising jurisdiction on the basis of these minimum contacts sufficiently comports with fairness and justice; (3) determine whether the sufficient minimum contacts, if any, arise out of or are related to the causes of action involved in the suit.

Reimer, 230 F.3d at 944 (7th Cir. 2000).  Thus, it is not enough for minimum contacts to exist to exercise specific personal jurisdiction.  Those minimum

---

*citing* Burger King, 471 U.S. at 476-77.

contacts must give rise to or be related to the cause of action asserted.  Id.

If not so related, exercising specific jurisdiction does not "sufficiently

comport with fairness and justice."  Id. at 943, *citing* Helicopteros v. Hall ,

466 U.S. at 414, 408, n. 8 (1984).

Following Reimer's steps, the Court first identifies the contacts the

Goldfarb Corporation has with the United States.  The Goldfarb

Corporation argues that its  "only connection . . . to the cause of action in

this case is that it is the 'grandparent' of the companies who executed the

agreements that gave rise to the withdrawal liability at issue."  (d/e 6 ¶ 3).

"[P]ersonal jurisdiction cannot be premised on corporate affiliation or stock

ownership alone where corporate formalities are substantially observed

and the parent does not exercise an unusually high degree of control over

the subsidiary ."  Reimer, 230 F.3d at 943.

However, the Fund asserts more than a normal parent-subsidiary

relationship.  The Fund's allegations and argument seem targeted at an

exception to that rule recognized in Reimer–where a parent exercises

unusual control over its subsidiary.  230 F.3d at 943.[18]  In Reimer, that

exception was not at issue and therefore not explored in any detail.

---

[18]The fund does not assert that its allegations support piercing of the corporate veil.

In the Court's opinion, the Fund's allegations arguably allow an inference that the Goldfarb Corporation exercised an unusually high degree of control over Fleming's fate with its lenders, a degree which allegedly allowed the Goldfarb Corporation to put its own interests before Fleming's and the creditors of Fleming.[19]  The Fund alleges secret meetings to negotiate Fleming's fate without Fleming's knowledge, including the discussion of closing and consolidating divisions of Fleming.  A reasonable inference arises that the lenders viewed the Goldfarb Corporation's control as a significant impediment to selling Fleming or declaring bankruptcy.  The Goldfarb Corporation does not address any of these allegations.

The Court therefore believes that the allegations, which are uncontroverted, suffice as minimum contacts for causes of action *arising out of or related to those contacts*.  For example, the bankruptcy adversary proceeding against the Goldfarb Corporation for breach of fiduciary duty and preferential transfers arguably arises from and is related to Goldfarb's dealings with the lenders.  Similarly, a cause of action regarding the

---

[19]The Goldfarb Corporation argues that it only got involved at the insistence of the lenders, in an attempt to save Fleming.  The Court is not deciding any factual disputes; the Court is only giving the Fund the benefit of all inferences at this stage.

Goldfarb Corporation's duties under the March 2002 letter agreement would be related to or arise from the allegations.

The Court does not believe, however, that *this* cause of action arises from or relates to the contacts.  For specific personal jurisdiction, "'the action must *directly arise* out of the specific contacts . . . .'" <u>RAR Inc. v. Turner Diesel, Ltd.</u>, 107 F.3d 1272,1277 (7th Cir. 1997), *quoting with approval* <u>Sawtelle v. Farrell</u>, 70 F.3d 1381, 1389 (1st Cir.1995) (emphasis added in <u>RAR</u>).  The duty to make contributions to the Fund arose from the collective bargaining agreements entered into by Fleming's subsidiaries. (Complaint ¶ 10).  The Fund does not contend that the Goldfarb Corporation was a party to the collective bargaining agreement or had anything to do with its negotiation, execution or implementation. There is no suggestion that the Goldfarb Corporation exercised control over Fleming's subsidiaries, much less to an unusually high degree.  Further, the Goldfarb Corporation relinquished what control it had over Fleming before Fleming filed for bankruptcy and before the sale was approved by the Bankruptcy Court.  The Goldfarb Corporation's liability for that withdrawal arises from its ownership of more than 80% of Fleming's stock, not from any of its alleged actions before the bankruptcy.  The March 2002

letter agreement subjects the Goldfarb Corporation to Michigan jurisdiction for disputes *over that agreement*, not over ERISA withdrawal liability.

To support its assertion that the allegations are related to this cause of action, the Fund argues that contractual privity with the collective bargaining agreements is not required.  The Fund argues that "to the extent that Goldfarb Corp. argues that specific jurisdiction hinges on whether plaintiff and defendant are parties to the same contract, its argument's logical conclusion would mean that a foreign magazine could libel a forum resident with impunity."  (d/e 9, 11).  The Court does not understand the analogy.  In any event, contractual privity is not the issue.  The issue is whether this cause of action is related to Goldfarb Corporation's deals and dealings with Fleming's lenders and Fleming from 2001-2003.

The Fund also cites United Elec. Radio & Mach. Workers v. 163 Pleasant Street Corp., 987 F.2d 39 (1st Cir. 1993), but the First Circuit in that case found specific personal jurisdiction over a Scottish parent corporation where the parent had retained an agent to negotiate the collective bargaining agreement and the negotiations occurred in Massachusetts.  There is no suggestion that the Goldfarb Corporation had

anything to do with the negotiations for the collective bargaining agreements here.

The Fund also argues that its cause of action is related to and arose from the Goldfarb Corporation's desire to "'rid itself'" of Fleming, *citing* Sante Fe Pacific Corp. v. Central States Pension Fund, 22 F.3d 725, 728 (7th Cir. 1994). (d/e 9, p. 12). Sante Fe held that a parent's sale of a subsidiary did not save the parent from withdrawal liability because the principal reason for the sale was to avoid that liability. 22 F.3d at 727. The Court does not se Sante Fe's relevance here.

The Fund also seems to argue that its cause of action arises from or is related to the Goldfarb Corporation's failure to "turn around Fleming's business" and thus avoid bankruptcy, or to the Goldfarb Corporation's failure to cooperate in a swift sale for maximum price. (d/e 9, p. 12). The theory appears to be that the Goldfarb Corporation's actions deepened Fleming's insolvency and prevented Fleming from being sold timely for maximum profit, which in turn caused the need to file for bankruptcy, which in turn caused the withdrawal liability.[20]

---

[20]The Fund advances that " . . . Goldfarb Corp.'s directly dealing with Fleming's Lenders in an attempt to turn its subsidiary around - and avoid an asset sale controlled by the Lenders - directly related to the Fund's withdrawal liability claim." (d/e 9, p. 12).

The record does not support an inference that the Goldfarb Corporation caused Fleming's bankruptcy and or its low sale price, but even if it did, that causal connection would not warrant exercising specific personal jurisdiction over the Goldfarb Corporation in this ERISA case. If the Goldfarb Corporation wrongfully caused Fleming's insolvency, the causes of action arising from that misconduct would be of the kind pursued in the bankruptcy proceedings. In short, any causal connection to the ERISA withdrawal liability is too loose and attenuated to be the basis for specific personal jurisdiction. *See* RAR, 107 F.3d at 1278.

In sum, this case is not related to and does not arise from Defendant's contacts. Therefore, the Fund has not made out a *prima facie* case for specific personal jurisdiction.

The Fund does not argue for general personal jurisdiction, nor would the argument be supported by the record. Contacts unrelated to the cause of action may give rise to general personal jurisdiction, but only if those "contacts are so continuous and systematic that the defendant could reasonably foresee being haled into court in that state for any matter." International Medical Group, Inc. v. American Arbitration Ass'n, Inc., 312 F.3d 833, 846 (7th Cir. 2002), *citing* Helicopteros, 466 U.S. at 414-15. As

discussed above, the normal parent-subsidiary relationship cannot confer specific or general personal jurisdiction.  To the extent Goldfarb exercised "unusually high control" over Fleming, that control was limited to its dealings with the lenders in regards to Fleming's default on the loans, not to the daily affairs of Fleming, much less its subsidiaries.  Further, it is undisputed that the Goldfarb Corporation relinquished whatever control it did have in February 2003, before the bankruptcy, sale and the filing of this action.  On the present record, the Goldfarb Corporation's only current contact with the United States are in the bankruptcy proceedings, which do not alone provide a basis for general jurisdiction.  Cf. Central States, Southeast and Southwest Areas Pension Fund v. Phencorp Reinsurance Co., Inc., 530 F.Supp. 2d 1008, 1017, 119-120 (N.D. Ill. 2008)(on remand, finding that evidence showed that defendant was doing business in forum at time suit was filed and was continuing to do business through maintenance of insurance policies).

The Fund also asks to be permitted discovery, but the discovery it seeks does not relate to this action.[21]  The Fund seeks discovery "first

---

[21]The Fund asserts that it has reviewed over 6,000 documents from the adversary proceeding, including the depositions of the Goldfarbs and Joanna Anderson of Bank One.

directed to Bank One, and then to Goldfarb Corp.'s dealing with Fleming's

Lenders. . .[T]he Fund would only seek limited discovery from Goldfarb

Corp., such as the explanation for Alonna Goldfarb's travel to Peoria, and

the extent of defendant's negotiations with Fleming's Lenders to either

keep Fleming operational, or sell its assets (and trigger withdrawal

liability)."  (d/e 9, p. 14)(parenthesis in original).  As discussed above, these

contacts do not give rise to or relate to this cause of action.  Delving into

further details about them would not change that conclusion.  *See* Reimer,

230 F.3d at 947 (even if discovery had been permitted to establish

minimum contacts throughout United States, those minimum contacts

"would not establish any contact arising out of or relating to the

defendants'" withdrawal liability) .

WHEREFORE, the Court RECOMMENDS that Defendant's motion to

dismiss for lack of personal jurisdiction be granted (d/e 6).

Any objections to this Report and Recommendation must be filed in

writing with the Clerk of the Court within ten working days after service of a

copy of this Report and Recommendation. See 28 U.S.C. § 636(b)(1).

Failure to timely object will constitute a waiver of objections on appeal.

Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).

See also Local Rule 72.2.

      ENTER:    April 9, 2008

*s/ Byron G. Cudmore*

_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE