E-FILED
Thursday, 07 August, 2008  12:19:21 PM
Clerk, U.S. District Court, ILCD

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| GCIU-EMPLOYER RETIREMENT FUND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-1174 |
| | ) | |
| THE GOLDFARB CORPORATION, a Canadian corporation, | ) | |
| | ) | |
| Defendant. | ) | |

### OPINION AND ORDER

Before the Court is Defendant's Motion to Dismiss for Lack of Personal Jurisdiction (Docs. 6, 7). Plaintiff filed a Response (Doc. 9). This matter was referred to United States Magistrate Judge Byron Cudmore for a Report and Recommendation. Judge Cudmore recommended that Defendant's Motion to Dismiss for Lack of Personal Jurisdiction be allowed. Plaintiff filed an Objection to the Report and Recommendation (Docs. 14, 15) and Defendant filed a Memorandum in Opposition (Doc. 17). For the following reasons, the Report and Recommendation is ADOPTED and Defendant's Motion to Dismiss for Lack of Personal Jurisdiction is GRANTED.

### BACKGROUND

Defendant Goldfarb Corporation ("Goldfarb") is a publicly traded investment holding company with its principal place of business in Canada. (Doc. 13 at 3; Doc. 1 at 2.) Goldfarb claims it does not maintain a place of business (or have a license to do so), employ individuals,

serve customers, or have a designated agent for service inside the United States.[1]  In April 1995,

Goldfarb purchased 66% of the stock in Fleming Packaging Corporation ("Fleming") and

thereafter began nominating Fleming's directors.  Fleming was a Delaware corporation with its

principal place of business in Peoria, Illinois, and operated as a large printer of labels and

specialty packaging products throughout the United States, Canada, and Mexico.  Goldfarb

claims it never controlled the daily affairs or internal policies of Fleming and asserts each

company filed a separate tax return based on separate payrolls, bank accounts, and leases.

In 1997, two years after Goldfarb had purchased stock in Fleming, Fleming entered into

a loan agreement with Bank One. (Doc. 1 at 5.)  In the years that followed, Fleming began

having financial difficulties, defaulted on the loan, and amended the loan agreement several

times.  After a received offer to purchase Fleming fell through in March 2000, Goldfarb took

Fleming off the market and "embarked on a turn around strategy."  (Doc. 1 at 5-6.)  However,

Fleming continued to have financial difficulties so its debt holders put their warrants to Fleming

in April 2001.  As a result, Goldfarb decided to purchase additional warrants and common stock

from the debt holders and increased its ownership in Fleming to 82.2%.  (Doc. 1 at 2, 6.)

However, prior to Goldfarb increasing its ownership, Fleming, through its wholly-owned

subsidiaries, entered into collective bargaining agreements requiring Fleming to contribute to

Plaintiff GCIU-Employer Retirement Fund ("GCIU"),[2] a multi-employer pension plan  These

---

[1] This Court shall draw all reasonable inferences in GCIU's favor because it has the burden to
make out a prima facie case of personal jurisdiction. Purdue Research Foundation v. Sanofi-
Synthelabo, S.A., 338 F.3d 773, 782 (7th Cir. 2003).  Therefore, the allegations in GCIU's
Complaint shall be considered true unless controverted by Goldfarb's affidavits.

[2]  GCIU is an acronym for Graphic Communication International Union.

2

agreements were effective from September 1999 to August 2002 and July 2000 to June 2003 and GCIU alleges that during this time period Goldfarb was in a "parent-subsidiary" control group with Fleming because its ownership in Fleming was greater than 80%.  (Doc. 1 at 3, 6.)

Meanwhile, in March 2001, three members of the Goldfarb family, Martin, Stanley, and Alonna Goldfarb were elected as Fleming officers while also maintaining seats on its Board of Directors.  (Doc. 1 at 5-6.)  That December, the Goldfarb Corporation presented a restructuring plan to Fleming's lenders, but they rejected the plan and declared Fleming in default in February 2002.  (Doc. 1 at 7; Doc. 9 at 5.)   In March 2002, Fleming and Bank One amended the loan agreement to require Fleming to sell off two of its businesses.  (Doc. 1 at 9.)  The same day, Goldfarb and Bank One entered into a subsequent agreement for Goldfarb to make a secured, subordinated $1.5 million loan to Fleming when it sold off the businesses.  This agreement was stipulated to be governed by Michigan law and contained a Michigan forum selection clause.

In July 2002, Martin, Stanley, and Alonna Goldfarb met with Bank One representatives in Canada before a scheduled Fleming board meeting.  (Doc. 1 at 9.)  GCIU alleges the purpose of the meeting was to notify Bank One of Goldfarb's plan to sell two divisions of Fleming for $30.5 million and use $4.5 million to restructure Fleming by consolidating its Peoria operations and closing others.  (Doc. 9-6 at 1.)

During the Fleming board meeting, Goldfarb reneged on its promise to infuse $1.5 million into Fleming, reminding Bank One that Fleming was not aware of the money and Goldfarb already considered the money lost.[3]  Meanwhile, the other lenders at the meeting

---

[3] GCIU alleges that Fleming first became aware of the $1.5 million agreement between Goldfarb and Bank One during the Fleming board meeting.

3

rejected Goldfarb's restructuring plan and insisted Fleming hire an independent consultant. (Doc. 9-6 at 2.)

In September 2002, Fleming sold off part of its Peoria operations, triggering Goldfarb's duty to loan Fleming $1.5 million.  Goldfarb did not perform so Bank One made a written demand on Goldfarb and notified Fleming of the default under the loan agreement.  Goldfarb sought to condition this $1.5 million loan on Bank One putting in additional money for restructuring.  (Doc. 1 at 10-11.)  Negotiations ensued and Goldfarb ultimately loaned Fleming $765,000 of the $1.5 million.  (Doc. 1 at 11-12.)  Bank One thereafter decided against adding more money in favor of a sale.  (Anderson Dep. pp. 21-22.)  In response, Goldfarb's agreed in principal to advance an *additional* $1.5 million to Fleming if the lenders funded Fleming's operations until July 2003.  (Doc. 1 at 12.)

However, between December 2002 and January 2003, the lenders rejected Fleming's proposals, sought to have Fleming sold, gave notice of default, and retained bankruptcy lawyers. (Doc. 1 at 12.)  The following month, the loan agreement was amended again and the lenders agreed to hold off exercising their default rights if Goldfarb relinquished control of Fleming to an acceptable third party.  (Doc. 1 at 12; Anderson Dep. p. 33.)  The lenders also stated Goldfarb's obligations would be forgiven and it would receive 3.5% of Fleming's sale proceeds if its officers resigned from Fleming's Board of Directors and Goldfarb executed an irrevocable proxy to vote its shares to George Gialenios, who was hired in 2002 to develop Fleming's restructuring plan.  (Doc. 1 at 14.)  Two of Fleming's subsidiaries agreed to be guarantors and Gialenios agreed to release Goldfarb from the $300,000 it owed him under its employment agreement with Fleming.  (Doc. 1 at 13.)  In response, Stanley, Martin, and Alana Goldfarb

4

resigned as directors of Fleming and Goldfarb signed an irrevocable proxy to Gialenios in
February 2003.

In May 2003, Fleming, along with two of its subsidiaries, filed for bankruptcy in the
Central District of Illinois.  See In re Fleming Packaging Corp., No. 03-82408 (Bankr. C.D. Ill.).
Goldfarb filed a proof of claim in the bankruptcy proceeding for $771,309.[4] (Doc. 1 at 16.)  In
July 2003, the Bankruptcy Court approved Fleming's sale for $26 million, which was less than
the balance owed to its secured lenders.  See In re Fleming Packaging Corp., 370 B.R. 774, 780
(Bankr. C.D. Ill. 2007).  Prior to the Bankruptcy Court's approval, Fleming repudiated the
collective bargaining agreements and Plaintiff GCIU decided Fleming had completely
withdrawn from the fund under the Employee Retirement Income Security Act ("ERISA").
(Doc. 1 at 17.)

In July 2004, the bankruptcy trustee, on behalf of Fleming's Estate, brought an adversary
proceeding against Goldfarb involving many of the same transactions and events alleged in this
case.  See In re Fleming, 370 B.R. 774.  In September 2004, GCIU issued Goldfarb a notice of
failure to pay its withdrawal liability and demanded payment.  Goldfarb responded that it was
not subject to personal jurisdiction in the United States and that ERISA did not reach it in
Canada.  (Doc. 1 at 18.)  GCIU filed the present suit in June 2007, seeking to collect the
withdrawal liability payments from Goldfarb.  Goldfarb has now filed the instant motion asking
this Court to dismiss GCIU's claim for lack of personal jurisdiction.

**LEGAL STANDARD**

---

[4]  This figure was the amount originally loaned to Fleming plus Alonna Goldfarb's expenses for
her August 2002 trip to Peoria, Illinois, on behalf of Goldfarb.

A magistrate judge's recommendation shall be reviewed *de novo*.  Fed. R. Civ. P. 72(b)(3); Willis v. Caterpillar Inc., 199 F.3d 902, 904 (7th Cir. 1999).  This Court may "accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge."  Fed. R. Civ. P. 72(b)(3).

The plaintiff bears the burden of demonstrating personal jurisdiction exists,  RAR, Inc. v. Turner Diesel, 107 F.3d 1272, 1276 (7th Cir. 2006), and must satisfy this burden prior to discovery being permitted on the issue.  Cent. States, Southeast and Southwest Areas Pension Fund v. Phencorp Reinsurance Co., 440 F.3d 870, 877-78 (7th Cir. 2006).  Even if the plaintiff satisfies its burden, this Court has discretion in deciding whether to allow the plaintiff to engage in discovery regarding jurisdiction.  Id.

In actions under Title I of ERISA, a district court will have personal jurisdiction over a defendant if the defendant was properly served and has sufficient minimum contacts with the United States.  Phencorp., 440 F.3d at 875.  For specific jurisdiction[5], a defendant must have "purposefully availed itself of the privilege of conducting activities within the forum state" and the exercise of jurisdiction must comport with "traditional notions of fair play and substantial justice."  Jennings v. AC Hydraulic A/S, 383 F.3d 546, 549 (7th Cir. 2004) (quotation omitted).

A defendant purposefully avails itself of the privilege of conducting activities within the forum state when its "conduct and connection with the forum [state] are such that it should reasonably anticipate being hailed into court there."  Cent. States, Southeast and Southwest

---

[5]  Personal jurisdiction comes in two forms (so-called "general" and "specific" jurisdiction).  See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408 (1984).  "To establish specific jurisdiction under the familiar 'minimum contacts' analysis, a plaintiff must show that the defendant has purposefully availed itself of the privilege of conducting activities within the forum state."  Jennings, 383 F.3d at 549 (citations omitted).

Areas Pension Fund v. Reimer Express World Corp., 230 F.3d 934, 943 (7th Cir. 2000) (citation

omitted).  Fair play and substantial justice also requires the contacts be related to or arise from

the facts forming the basis of the cause of action.  Phencorp, 440 F.3d at 875.

## JUDGE CUDMORE'S RECOMMENDATION

Judge Cudmore recommended this Court dismiss GCIU's claim for lack of personal

jurisdiction because GCIU was unable to show that its claim arose from or was related to

Goldfarb's contacts with the United States.  While Judge Cudmore found that Goldfarb had

sufficient minimum contacts with the United States, he found those contacts were based on

GCIU's allegations that Goldfarb exercised a high degree of control over Fleming's fate with its

lenders, and put its own interests before Fleming and Fleming's debtors.  Judge Cudmore

inferred that the lenders believed Goldfarb had significantly impeded Fleming's sale or its

declaration of bankruptcy and this was sufficient to allow specific jurisdiction for claims

"*arising out of or related to those contacts.*" (Doc. 13 at 18.)

However, notwithstanding Judge Cudmore's finding that Goldfarb had sufficient

minimum contacts with the United States as alleged by GCIU, he nevertheless found that

GCIU's claim arose from collective bargaining agreements entered into by Fleming's

subsidiaries.  These agreements were not related to Goldfarb's contacts with the United States as

GCIU never suggested "the Goldfarb Corporation exercised control over Fleming's subsidiaries"

and Goldfarb had relinquished all control of Fleming prior to Fleming filing for bankruptcy.

(Doc. 13 at 19.)  Therefore, the relation between the collective bargaining agreements and

Goldfarb's contact with Fleming was too tenuous for specific jurisdiction.

Judge Cudmore also addressed GCIU's assertion that its claim was related to Goldfarb's

7

failure to turn around Fleming's business.  GCIU argued that this failure caused Fleming's

bankruptcy, and thus, Fleming's withdrawal liability.  (Doc. 9 at 12.)  However, Judge Cudmore

determined that even if Goldfarb somehow caused Fleming's bankruptcy, specific jurisdiction

was improper because such misconduct could be pursued in Fleming's  bankruptcy proceedings.

(Doc. 13 at 22.)

       Although GCIU did not argue for general jurisdiction, Judge Cudmore also found the

record did not support an exercise of general jurisdiction.  General jurisdiction allows for

personal jurisdiction over actions unrelated to the defendant's contacts with that forum if those

contacts are "so continuous and systematic" that the defendant would foresee being brought into

court there.  Int'l Med. Group, Inc. v. American Arbitration Ass'n, 312 F.3d 833, 846 (7th Cir.

2002) (citation omitted).  Judge Cudmore reasoned that Fleming's  bankruptcy proceedings did

not amount to sufficient contact with the United States to establish general jurisdiction over

Goldfarb.

       Finally, Judge Cudmore recommended that GCIU's discovery request be denied because

further information into matters such as Alonna Goldfarb's trip to Peoria and Goldfarb's

negotiations with Fleming's lenders would be unrelated to GCIU's cause of action and delving

into such details would not change that conclusion.

## DISCUSSION

       GCIU's Objection to the Report and Recommendation contains the following arguments:

(1) Judge Cudmore "applied an overly restrictive legal standard" for deciding whether GCIU's

withdrawal liability claim against Goldfarb arose from its minimum contacts with the United

States; and (2) Judge Cudmore abused his discretion in recommending this Court "not allow

[GCIU] to engage in discovery to flesh out the complaint's allegations."  (Doc. 15 at 1.)  Both

claims are without merit.

### A. Judge Cudmore's finding that GCIU's claim did not arise from Goldfarb's contacts with the United States.

GCIU argues that Judge Cudmore erred in his Report and Recommendation because GCIU's withdrawal liability claim relates to and arises out of Goldfarb's contacts with the United States.  GCIU does not dispute Judge Cudmore's finding that Goldfarb had requisite minimum contacts, but merely his determination that GCIU's cause of action was unrelated to those contacts.[6]

GCIU's contends that the Seventh Circuit's analysis in RAR, Inc. v. Turner Diesel, supports an exercise of specific jurisdiction.  107 F.3d 1272 (7th Cir. 2006).  In RAR, the plaintiff filed a breach of contract claim alleging the defendant failed to properly package two engines which came loose and caused significant damage during transit.  The plaintiff sought an exercise of specific jurisdiction in Illinois based on the defendant's prior contracts to purchase goods within the state as well as the return of products previously purchased in Illinois.  The Seventh Circuit held that specific jurisdiction was not appropriate because a "loose causal connection between a suit and a defendant's forum contacts" is an insufficient basis for personal jurisdiction.  Id. at 1277.  Furthermore, the defendant's past contacts with Illinois did not bear on the legal dispute at issue nor did they inform the court about the economic substance of the contract.  Id.  Despite GCIU's assertions, RAR supports a *denial* of specific jurisdiction because the relationship between Goldfarb and Fleming's subsidiaries is not only attenuated, but

---

[6]  Goldfarb also does not dispute Judge Cudmore's findings of sufficient minimum contacts. This Court accepts Judge Cudmore's findings of minimum contacts as articulated *supra*. Therefore, the issue at bar is whether those minimum contacts are related to GCIU's withdrawal liability claim.

Goldfarb had no alleged influence on either the subsidiaries or on their collective bargaining agreements with GCIU.

GCIU also argues that Goldfarb's previous involvement in Fleming relates to the cause of action because Goldfarb's decisions and actions "culminated in the repudiation of the labor contracts," which resulted in complete withdrawal from the GCIU fund.  (Doc. 15 at 9.)  Specifically, GCIU claims Goldfarb bypassed working with Fleming to initiate direct dealings with Fleming's lenders.  In doing so, GCIU argues that Goldfarb pursued an "exit strategy," which caused Fleming's withdrawal liability.[7]  (Doc. 15 at 9.)  Therefore, GCIU argues its claim arose from Goldfarb's contacts with Fleming's lenders and not from Fleming's subsidiaries' contractual obligations to contribute to GCIU.

However, GCIU fails to mention that the initiation of Fleming's withdrawal from the GCIU fund, which was sparked by the sale of Fleming's assets in July 2003, occurred after Goldfarb had completely relinquished its control over Fleming.  Additionally, the allegations here do not support a reasonable inference that Goldfarb caused Fleming's ultimate withdrawal.[8]  Instead, they strongly infer that Fleming's lenders caused Fleming to withdraw from GCIU, as the lenders originally sought to have Fleming sold in January 2003.  See (Doc. 1 at 12-13, 22.)  Even if Goldfarb "injected itself" between Fleming and its lenders, the lenders rejected Goldfarb's proposals to restructure Fleming and Goldfarb's interactions with the lenders had no

_____

[7]  GCIU also argues this point in taking issue with Judge Cudmore's statement that any liability resulting from Goldfarb causing Fleming's insolvency and ultimate bankruptcy could be pursued in bankruptcy proceedings.  See (Doc. 15 at 11.)

[8]  GCIU's apparent theory is that Goldfarb's actions deepened Fleming's insolvency, which prevented Fleming from being sold for a maximum profit, which then resulted in Fleming necessarily filing for bankruptcy, and which ultimately led to the withdrawal liability.  (Doc. 13 at 21) (citing Doc. 9 at 12).

impact on the collective bargaining agreements entered into by Fleming's subsidiaries. Additionally, the letter agreement between Goldfarb and Bank One in March 2002 only subjected Goldfarb to jurisdiction in Michigan over disputes relating to *that* agreement and not over the present ERISA withdrawal liability claim.

Furthermore, Goldfarb's status as the parent company in a parent-subsidiary control group does not automatically subject it to personal jurisdiction even though some of its representatives served on Fleming's Board of Directors.  See Reimer, 230 F.3d at 945 (parent company may provide administrative services for subsidiary during the course of business without invoking personal jurisdiction).  Goldfarb did not have administrative control over Fleming nor has GCIU ever alleged that Goldfarb had any control over Fleming's subsidiaries or was at any time a party to the collective bargaining agreements.  While GCIU also argues that contractual privity between Goldfarb and Fleming's subsidiaries in the collective bargaining is not necessary to establish specific jurisdiction, this argument does not change the fact that GCIU's ERISA claim is not related to Goldfarb's interactions with Fleming and its lenders prior to Goldfarb relinquishing its control of Fleming.

Furthermore, the Seventh Circuit has ruled that the determination of which group initiated the negotiations is a relevant factor in personal jurisdiction inquiries. Logan Prods, Inc. v. Optibase, Inc., 103 F.3d 49, 53 (7th Cir. 1996); Madison Consulting Group v. South Carolina, 752 F.2d 1193, 1202 (7th Cir. 1985) (personal jurisdiction over a party more likely when that party initiated the forum contacts).  Here, Fleming's lenders initiated the negotiations with Goldfarb.  In the Complaint, GCIU stated that Bank One "demanded" Goldfarb invest additional equity into Fleming, resulting in the subsequent negotiations.  (Doc. 1 at 8.)  Fleming's lenders

also decided that they would only hold off exercising their default rights if Goldfarb relinquished its control over Fleming.  Three members of the Goldfarb family were on Fleming's board of directors, and, as members of Fleming's board, they did meet with Bank One.  However, Plaintiff does not allege that the Goldfarb family violated their duty of loyalty and there is no reason for this Court to conclude that as Fleming board members, they were not acting on Fleming's behalf when they met with Bank One.

Finally, GCIU claims Goldfarb is an "employer" for ERISA liability purposes because it owned more than 80% of Fleming at the time of the bankruptcy.  (Doc. 15 at 10.)  However, whether Goldfarb is an "employer" is immaterial because a parent-subsidiary relationship does not create personal jurisdiction if the parent does not engage in conduct triggering withdrawal liability.  See Cent. States, Southeast & Southwest Areas Pension Fund v. Hunt Truck Lines, Inc., 204 F.3d 736, 739 (7th Cir. 2000).  Because this Court has already found that Goldfarb did not cause Fleming's  withdrawal from GCIU or have any connection with the collective bargaining agreements entered by Fleming's subsidiaries, an inquiry into Goldfarb's status as an "employer" is unnecessary.

**B.  Judge Cudmore's recommendation to not allow GCIU to engage in discovery.**

GCIU's final argument is that this Court should reject Judge Cudmore's recommendation and allow GCIU to engage in discovery to further investigate the issue of specific jurisdiction.  Specifically, GCIU is seeking additional information regarding Alonna Goldfarb's trip to Peoria or Goldfarb's negotiations with Fleming's lenders to keep Fleming operational.  See (Doc. 13 at 24.)  However, GCIU relies on its claim that Judge Cudmore was too narrow in his finding that GCIU had not established a prima facie case of personal jurisdiction.

Allowing a party to engage in discovery is within a district court's discretion, but only if that party was able to initially demonstrate that personal jurisdiction exists.  <u>See</u> <u>Phencorp.</u>, 430 F.3d at 877-78.  This Court agrees with Judge Cudmore that the limited discovery sought would not relate to GCIU's ERISA withdrawal liability claim.  Furthermore,  GCIU has failed to present a prima facie case of personal jurisdiction, so it is therefore proper to deny GCIU's request for discovery on the issue of jurisdiction.

## CONCLUSION

IT IS THEREFORE ORDERED that Defendant's Motion to Dismiss for Lack of Personal Jurisdiction is GRANTED and Judge Cudmore's Report and Recommendation is ADOPTED in its entirety.  Plaintiff's claim is dismissed without prejudice.

CASE TERMINATED

ENTERED this    6th   day of August, 2008

                        s/Joe B. McDade
                     JOE BILLY McDADE
                  United States District Judge

13